**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE CITY OF ST. CHARLES, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE COUNTY OF ST. CHARLES, | ) | Case No. 4:23-cv-846 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNION ELECTRIC COMPANY d/b/a | ) | |
| AMEREN MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendant Union Electric Company d/b/a Ameren Missouri

("Ameren") hereby removes the state court action filed by Plaintiffs the City of St. Charles ("City")

and the County of St. Charles ("County") (together, "Plaintiffs"), captioned *City of St. Charles, et*

*al. v. Union Electric Co.*, No. 2311-CC00526, filed in the Circuit Court of St. Charles County,

Missouri ("State Court Action"), pursuant to 28 U.S.C. §§ 1331, 1367, 1441, 1442, and 1446 and

42 U.S.C. § 9613(b).

## INTRODUCTION

1.      This lawsuit arises out of environmental remediation work conducted by the United

States Environmental Protection Agency ("EPA") and Ameren at a Superfund site in St. Charles,

Missouri.   Because the Superfund site includes an Ameren electrical substation within its

boundaries, Ameren has performed an investigation and remediation work under the EPA's

direction and jurisdiction for more than a decade.   Ameren has performed that investigation and

1

remediation work under two administrative orders issued by the EPA in 2012 and 2018.

2.      The gist of the lawsuit is that Plaintiffs are not satisfied with the investigation and remediation work that Ameren performed under the EPA's orders.  The EPA, however, in the exercise of its exclusive jurisdiction under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), has approved the work at every step.  Yet, instead of allowing the EPA and Ameren to complete the investigation and remediation work in compliance with federal law, Plaintiffs decided to perform their own investigation, implement their own remedies, and recover the costs of unapproved activities from Ameren.

3.      The newly filed State Court Action is not the City's first attempt to dispute the EPA's remedial decisions.  Just a few months ago, in February 2023, the City sought to intervene in federal litigation filed by the EPA to lodge a newly proposed consent decree with this Court.  In that litigation, the City submitted a proposed complaint to dispute Ameren's remediation efforts under the EPA's administrative orders and to seek additional relief beyond the EPA's proposed consent decree.  That additional relief included the right to seek, from Ameren, the City's unauthorized investigation and remediation costs under CERCLA.  The Court stayed the federal litigation pending further evaluation by the EPA.  Seizing that opportunity, Plaintiffs filed the State Court Action, fully aware that federal court is the proper jurisdiction for their claims.

4.      Plaintiffs' running dispute with EPA and Ameren inherently requires resolution of federal questions, but the Petition for Damages improperly seeks to avoid federal jurisdiction by obscuring the federal nature of their lawsuit.  A few months ago, the City's 20-page proposed complaint extensively detailed the EPA's 40-year history at the Superfund site; the cleanup obligations imposed on Ameren under CERCLA; and the legal requirements of the two administrative orders issued by the EPA specific to Ameren's cleanup.  Now, Plaintiffs' 29-page

Petition for Damages conspicuously never mentions the EPA, CERCLA, or the EPA's administrative orders—all of which govern Ameren's remediation activities at the site.  This is a classic example of artful pleading, and Plaintiffs cannot escape federal subject matter jurisdiction through these deliberate omissions.

5.     Notwithstanding Plaintiffs' transparent pleading tactics, the State Court Action necessarily raises disputed, substantial federal questions. Plaintiffs' right to relief under state law requires resolution of questions surrounding Ameren's compliance with the EPA's legally binding administrative orders issued under CERCLA.   Namely, Plaintiffs' claims arise out of Ameren's allegedly "negligent" and "unlawful" remediation work performed under the direction and approval of the EPA under these orders. As pleaded, Plaintiffs also seek to bring cost recovery claims under CERCLA, albeit disguised as state law claims seeking that recovery under the rubric of "damages."  Moreover, Plaintiffs' claims trigger the federal officer statute because Ameren conducted its remediation efforts under the guidance, control, and oversight of the EPA.  As the City already acknowledged months ago, this is a federal dispute that belongs in federal court.

## BACKGROUND

### The 2012 and 2018 Settlement Agreements and Orders on Consent Between Ameren and the EPA

6.     In 2010, cis-1,2-dichloroethene ("DCE") was detected in City Well 5 in the Elm Point Wellfield.  City Well 5 is located approximately 180 feet north of Ameren's Huster Road Substation ("Substation").

7.     In response to the detection of contaminants in City Well 5, the EPA invoked the Emergency Contingency Plan Response and required an investigation.  Between October and December 2011, groundwater samples were taken from 84 locations, including four samples on or near the Substation.  The results from these samples indicated the presence of DCE and vinyl

chloride ("VC") near the Substation.

8.      Ameren received a General Notice of Liability Letter and 104(e) Information Request from the EPA on January 20, 2012 ("Notice of Liability").  *See* Exhibit 1, *General Notice of Liability Letter and 104(e) Information Request to Ameren*, https://semspub.epa.gov/work/07/30246021.pdf (last visited June 29, 2023).  The EPA's Notice of Liability informed Ameren it may be liable under CERCLA and requested information regarding Ameren's use of chlorinated solvents at the Substation. *Id.*

9.      Ameren complied with the terms of the Notice of Liability and began to conduct initial testing and investigation at the Substation.

10.      On December 28, 2012, Ameren entered into a Settlement Agreement and Order on Consent with the EPA and the Missouri Department of Natural Resources ("MDNR") ("2012 Settlement Agreement").  *See* Exhibit 2, *Findett Superfund Site Operable Unit 4 Timeline*, https://semspub.epa.gov/work/07/30826873.pdf (last visited June 13, 2023).  Ameren operated exclusively under the terms of 2012 Settlement Agreement until 2018, when Ameren entered into a new Administrative Settlement Agreement and Order on Consent ("2018 Settlement Agreement") to conduct a remedial investigation and feasibility study.  *See* Exhibit 3, *2018 Settlement Agreement* at ¶ 17, https://semspub.epa.gov/work/07/30294608.pdf (last visited June 13, 2023).

11.      Pursuant to the terms of the 2012 Settlement Agreement, and with direction, oversight, and approval from the EPA, Ameren conducted soil and groundwater sampling at the Substation; constructed and operated a groundwater treatment system to intercept and treat groundwater as it passed underneath the Substation; removed, disposed, or treated contaminated soil from the Substation; and evaluated potential future response actions to ensure that the

groundwater achieved Safe Drinking Water Act maximum contaminant levels.  *See id.*

12.     Building on the work completed under the 2012 Settlement Agreement, the 2018 Settlement Agreement required Ameren to, among other things, conduct a remedial investigation and feasibility study in accordance with the Statement of Work attached to the 2018 Settlement Agreement; submit all project plans to the EPA for approval; submit all reports to the EPA for review and approval; and reimburse the EPA for all future response costs.  *Id.* at ¶¶ 28–30, 32, 105.  Ameren conducted these activities pursuant to and in accordance with the terms of the 2018 Settlement Agreement with direction, oversight, and approval from the EPA.

13.     Based on Ameren's work under the 2018 Settlement Agreement, a proposed remediation plan was developed and approved by the EPA.  The EPA made the proposed remediation plan available for public comment, and a public meeting was held in February 2021. The Final Record of Decision was issued in June 2021.  *See* Exhibit 4, *Findett History Table*, https://semspub.epa.gov/work/07/30826874.pdf (last visited June 13, 2023).

14.     Several months later, in December 2021, a sample from a monitoring well, piezometer 11 ("PZ-11") located near City Well 6 showed a detection of DCE and VC slightly above maximum contaminant levels.  *See* Exhibit 5, *Findett Corp. Superfund Site Fact Sheet*, November 2022, https://semspub.epa.gov/work/07/30825302.pdf (last visited June 20, 2023). Sampling of this well had historically "not indicated the presence of [volatile organic compounds] in [City Well] 6 above safe drinking water standards." *Id.*  At the EPA's direction, in January 2022 Ameren began "sampling PZ-11 and [City Well] 6 biweekly to monitor any increasing trends or potential threats to the city's water supply." *Id.*

**The Consent Decree Litigation**

15.     In 2022, the EPA issued a Proposed Consent Decree for Ameren to complete and

implement Remedial Design and Remedial Actions to implement the Final Record of Decision. *See* Exhibit 2.

16.     On September 28, 2022, the EPA filed suit in this Court to lodge the Proposed Consent Decree, and that suit remains pending in this Court before the Hon. John A. Ross ("Consent Decree Litigation").  *See* Exhibit 6, *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, Docket Sheet.  Public notice of the Proposed Consent Decree was published in the Federal Register on October 4, 2022.  87 Fed. Reg. 60199 (Oct. 4, 2022).  On November 17, 2022, the EPA held a public meeting to discuss the Proposed Consent Decree.  *Id.*

17.     After the EPA lodged the Proposed Consent Decree with this Court, the City engaged in a full-blown effort to prevent its approval without modifications favorable to the City. Specifically, the City has stated on numerous occasions that Ameren should be required to fund costly and unnecessary remedial efforts, including installing additional treatment systems at the Elm Point Treatment Plant.  *See, e.g.*, Exhibit 7, Mark Schlinkmann, *St. Charles wants Ameren to pay up to $60 million to protect city drinking water*, St. Louis Post Dispatch, Oct. 27, 2022, https://www.stltoday.com/news/local/stcharles/st-charles-wants-ameren-to-pay-up-to-60-million-to-protect-city-drinking-water/article_9132b42b-69e9-5461-a9fd-88ac74194cf1.html (last visited June 5, 2022); Exhibit 8, Kevin Held, et al., *St. Charles shuts down 6th of 7 water wells due to suspected contamination*, Fox 2 Now,  Feb. 16, 2023, https://fox2now.com/news/missouri/st-charles-shuts-down-6th-of-7-water-wells-due-to-suspected-contamination/ (last visited June 5, 2023).  In criticizing the EPA's proposed remedy, the City wanted "for new wells and for the treatment system [to] be included in this final agreement for Ameren, that they be re-included and reintroduced by the [EPA]."  Exhibit 9, Transcript of the City of St. Charles November 21, 2022 Public Meeting at 8. The City created a dedicated webpage discussing drinking water wells where

it states, that it "renewed its demands that the USEPA, Missouri DNR, and Ameren Missouri replace drinking water wells CS-6 and SW-8, as well as provide upgrades to the City water treatment plant…." City Drinking Water Wells, https://www.stcharlescitymo.gov/1111/City-Drinking-Water-Wells, (last visited June 22, 2023).

18.     Ultimately, on February 3, 2023, the City moved to intervene in the Consent Decree Litigation.  *See* Exhibit 10, *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, ECF No. 13, City of St. Charles's Motion to Intervene ("City's Motion to Intervene").   In the City's Proposed Complaint, the City fully acknowledged the role of 2012 and 2018 Settlement Agreements between Ameren and the EPA. Exhibit 11, *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, ECF No. 14-1, at ¶¶ 33–35, Plaintiff-Intervenor City of St. Charles, Missouri's Proposed Complaint in Intervention ("Proposed Complaint").   As the City alleged in the Proposed Complaint, the "[t]he 2012 [Settlement Agreement] *required* Ameren, among several actions, to: … (2) contain and treat contaminated groundwater migrating off" the site containing the Substation.  *Id.*, at ¶ 33 (emphasis added).  The City alleged, however, that contaminants had still been detected after Ameren's entry into and performance under that agreement with the EPA.  *See id.*, at ¶¶ 40–67.

19.     The City argued that the Court should reject the Proposed Consent Decree.  *See* Exhibit 10.  The City similarly described the EPA's Final Record of Decision as "fundamentally flawed," and charged that the Proposed Consent Decree was "unreasonable," "unfair," and "not consistent with CERCLA's purposes."   Exhibit 11.   The City contended that "the Proposed Consent Decree . . . fail[ed] its stated objective."  *See* Exhibit 12, *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, ECF. No. 14 at 9, City of St. Charles's Memorandum in Support of Its to Intervene.

20.     Subsequently, the EPA withdrew the Proposed Consent Decree in its current form so that the EPA could evaluate "whether the remedy selected in the 2021 Record of Decision … needs to be amended or altered, and/or whether any additional response actions are appropriate." *See* Exhibit 13, *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, ECF No. 19 at 2, Notice of Withdrawal of Proposed Consent Decree. The EPA noted: "Ameren has cooperated in the investigation being conducted, and will continue to perform response actions at the Site under the 2018 [Settlement Agreement]." *Id.* at 3.

21.     Accordingly, at the same time that EPA withdrew the Proposed Consent Decree, "EPA directed Ameren to perform additional work under [the 2018 Settlement Agreement], including a focused feasibility study (FFS) that will determine whether additional remedies are necessary, and interim response actions, including in situ chemical reduction and installation of [zero valent iron] barriers."   *See* Exhibit 14 at 9, *Update FAQs for Findett OU4*, https://semspub.epa.gov/work/07/30826872.pdf (last visited June 15, 2023).  EPA "invoke[d] the additional work provisions of the [2018 Settlement Agreement]" and directed Ameren to complete additional work at the Substation.  *See* Exhibit 15, February 16, 2023 Letter from EPA to Ameren regarding the Findett Corp. Superfund Site, Operable Unit 4.

22.     At the request of the parties, the Court stayed the Consent Decree Litigation on February 17, 2023. *See* Exhibit 16, *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, Order.  The Court directed the parties to file a joint status report on August 17, 2023.  *Id.*

23.     Ameren is now conducting ongoing interim remedial actions while the Consent Decree Litigation is stayed pending additional investigation.  *See* Exhibit 15; Exhibit 13 at 2.  Such additional groundwater investigatory work has been performed by both Ameren and the EPA. Ameren's performance of its response actions will allow EPA to determine "whether the remedy

selected in the 2021 Record of Decision for OU4 needs to be amended or altered, and/or whether any additional response actions are appropriate." *Id.* While Ameren continues to perform work at EPA's direction under the 2018 Settlement Agreement, ongoing monitoring confirms that neither VC nor DCE are present in the influent or effluent of the City's public water supply. *See* Exhibit 14 at 5.

### The State Court Action

24.     In the weeks leading up to State Court Action, the City announced it would be filing a lawsuit "in state court, not federal court," to find a "pathway around Superfund" [*i.e.*, CERCLA] because the City believed "the amount of damages and remedy, was not adequate" under CERCLA. *See LIVE: St. Charles mayor makes announcement on contaminated wellfield*, KSDK NEWS, https://www.youtube.com/watch?v=I-u-s8-XBmQ at 8:30-9 (last visited June 27, 2023).

25.     On May 24, 2023, over 10 years after the EPA had begun directing Ameren how to address the contamination at City Well 5, Plaintiffs filed the State Court Action.  As with the Consent Decree Litigation, the Petition for Damages disputes the effectiveness of Ameren's remedial actions taken under the direction and authority of the EPA and pursuant to the EPA's legally binding administrative orders.  The City's two complaints even raise the same contamination allegations. *Compare* Pet. for Damages., at ¶ 34 ("Contaminants necessitated the shutdown of City wells 6, 8, and 9 in 2022, as part of the City's continuing effort to protect the health of the public…."), *with* Exhibit 11, Proposed Compl., at ¶ 46 ("In 2022, the City suspended operation of CW-6, CW-8, and CW-9 as a result of the presence of VC and cis-DCE in those production wells in order to protect public health.").

26.     The Petition for Damages does not mention EPA or CERCLA.  Nevertheless, Plaintiffs fully understand the role of the EPA and its administrative orders in the cleanup.  In the

Proposed Complaint in the Consent Decree Litigation, the City acknowledged that it was the 2012 Settlement Agreement that "required" Ameren to "contain and treat contaminated groundwater migrating off" the Substation, giving rise to the City's claims.  Exhibit 11 (emphasis added). In the Petition for Damages, Plaintiffs continue to dispute the effectiveness of those actions, performed with the EPA's direction, oversight, and approval.  Plaintiffs nevertheless allege that Ameren's "cleanup efforts" have not adequately remediated the Site because Ameren's efforts "failed to remove all Contaminants from the groundwater." Pet. for Damages at ¶¶ 31, 32, 47.

27.     Plaintiffs dispute the adequacy of Ameren's remediation efforts pursuant to CERCLA based on nine state law theories:  (1) trespass; (2) private nuisance – permanent; (3) private nuisance – temporary; (4) public nuisance; (5) negligence; (6) negligence per se; (7) strict liability; (8) statutory trespass to personalty; and (9) unjust enrichment.  *Id.* at ¶¶ 49–116.  Among other damages, Plaintiffs allege that Ameren's efforts have caused the City to incur response costs to ensure the safety of the water pumped from the wellfield.  Specifically, Plaintiffs allege that, "[d]ue to the migration of Contaminants from Ameren's Substation, the City has incurred millions of dollars in costs to ensure the availability of safe drinking water free from Contaminants for City residents and others, including the County and County residents."  *Id.* at ¶ 39.

28.     Plaintiffs' claims arise under federal law, namely CERCLA and the EPA's associated administrative orders, which are tailored to Ameren's remediation efforts at the site. Furthermore, Plaintiffs' claims, which dispute Ameren's actions under the guidance and authority of the EPA, are removable under the federal officer statute.

29.     Ameren timely removes this action under 28 U.S.C. § 1446(b)(1).  Plaintiffs served Ameren on June 2, 2023, and Ameren is filing this notice of removal within 30 days after service. *See* Exhibit 17, Summons in Civil Case.

10

30.     Venue is proper in the Eastern District of Missouri, Eastern Division because the State Court Action is pending in the Circuit Court of St. Charles County, Missouri.  *See* 28 U.S.C. § 1441(a); L.R. 2.07.

31.     Pursuant to 28 U.S.C. § 1446(a) and L.R. 2.03, a copy of the Petition for Damages and all other pleadings and papers filed in the State Court, as well as the docket sheet, are attached hereto as Exhibit 18.

32.     Ameren will promptly file a true and correct copy of this Notice of Removal in the Circuit Court of St. Charles County and serve written notice of the same upon all parties to the action, as required by 28 U.S.C. § 1446(d).

33.     Ameren reserves the right to amend or supplement this Notice of Removal.

## GROUNDS FOR REMOVAL

**I.     The Court Has Jurisdiction Under 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b) Because Plaintiffs' Claims Arise Under CERCLA, Regardless of Plaintiffs' Artful Pleading.**

34.     Under 28 U.S.C. § 1441(a), a civil action filed in state court may be removed to a federal district court if the district court has original jurisdiction over the action.  By statute, this Court has original jurisdiction because: (a) Plaintiffs' claims arise under the laws of the United States, 28 U.S.C. § 1331; and (b) Plaintiffs allege a controversy arising under CERCLA, 42 U.S.C. § 9613(b).

35.     Even though Plaintiffs attempt to plead causes of action under state law, Plaintiffs' case nevertheless "arises under" federal law because their "right to relief under state law requires resolution of a substantial question of federal law."  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997); *see also Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 13 (1982) (case arises under federal law when "the plaintiffs' right to relief necessarily depends on resolution of a substantial question of federal law").

36.     Furthermore, although Plaintiffs noticeably avoid mentioning the EPA or CERCLA in their Petition for Damages, Plaintiffs' pleading is an attempt to disguise a federal cause of action for liability under CERCLA regarding "response costs" as a set of state law claims.  The artful pleading doctrine prohibits this pleading strategy, and this Court retains its jurisdiction.

A.     **Plaintiffs' Claims Require Resolution of a Substantial, Disputed Question of Federal Law Regarding Ameren's Compliance With the EPA's Legally Binding Administrative Orders.**

37.     A defendant properly removes state law claims based on a "substantial federal question" where (1) the right to relief under state law depends on the resolution of a substantial, disputed federal question, and (2) the exercise of jurisdiction will not disrupt the balance between federal and state jurisdiction adopted by Congress.  *Pet Quarters Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (citing *Grable & Sons Metal Prods., Inc. v. Barue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

38.     In 2012 and 2018, Ameren and the EPA entered into settlement agreements under CERCLA regarding the remediation of the site.  Ameren's extensive settlement agreements with the EPA are "legally binding administrative orders" under federal law.  *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1355 (2020) (citing 42 U.S.C. §§ 9609(a)(1)(E), 9622(*l*)).  Pursuant to these orders, Ameren was required, under the direction and oversight of the EPA, to "contain and treat contaminated groundwater migrating off the Substation Property."  Exhibit 19, *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, ECF No. 2-1, at 7, Remedial Design/Remedial Action Consent Decree.  Plaintiffs, however, dispute the effectiveness of these federally ordered actions in achieving the results Plaintiffs desire.

39.     Under CERCLA, "[w]hen … a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation

12

and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President."  42 U.S.C. § 9622(e)(6).  In other words, since 2012, Ameren was, and is, prohibited from taking any remedial actions without approval from the EPA.

40.     Each Plaintiff is a "potentially responsible party" because Plaintiffs, as alleged, are "owners" of a "facility," which is defined to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  *Atl. Richfield*, 140 S. Ct. at 1352 (quoting 42 U.S.C. § 9601(9)(B)).  Therefore, Plaintiffs *also* were, and are, prohibited from taking any remedial actions without approval from the EPA.  *Id.*; 42 U.S.C. § 9622(e)(6).

41.     Plaintiffs assert negligence claims directly related to Ameren's performance under the 2012 and 2018 administrative orders.  Plaintiffs' allegations do not address Ameren's pre-2012 actions, only its post-2012 actions.  Specifically, Plaintiffs allege that Ameren breached a duty of care by "negligently, carelessly, and recklessly (a) failing to control and contain Contaminants on its property; [and] (b) failing to prevent migration of Contaminants onto and in the City's Property and the County's Property."  Pet. for Damages at ¶ 83.  As a result, the adjudication of Plaintiffs' negligence claims necessarily requires the assessment of Ameren's compliance with the two agreements between Ameren and the EPA, which are legally binding administrative orders under federal law. *See, e.g.*, *Camillus Clean Air Coal. v. Honeywell Int'l, Inc.*, No. 5:13-CV-365 (FJS/DEP), 2013 WL 4774507, at *2 (N.D.N.Y. Sept. 4, 2013) ("[A]ll of these state-law claims raise a federal issue, i.e., whether Defendant has complied with the Consent Decree and, if not, whether Defendant has breached a duty that it owes to Plaintiffs."), *aff'd sub nom. Bartlett v. Honeywell Int'l Inc.*, 737 Fed. Appx. 543, 547 (2d Cir. 2018).

42.   In Plaintiffs' other counts, Plaintiffs variously allege that the continued existence or migration of contaminants under the EPA's administrative orders is "unlawful and unauthorized," Pet. for Damages at ¶¶ 52, 108 (Counts I and VIII), that Ameren's operation, maintenance, and use of the Substation under those agreements is "unreasonable," *id.* at ¶¶ 63–64, 66–67, 69–70, 72–73 (Counts II, III and IV), and even that Ameren was legally required to "eliminate the risk" of its conduct, *id.* at ¶ 102 (Count VII).   Resolution of these claims will necessarily require an analysis of compliance with, the 2012 and 2018 administrative orders, as well as CERCLA itself.

43.   Plaintiffs' new Petition for Damages, however, conspicuously does not mention these orders or the EPA or even CERCLA by name.   Even so, Plaintiffs' claims fall under the artful pleading exception to the well-pleaded complaint rule.   *Lehman Brothers Inc. v. City of Lodi*, 333 F. Supp. 2d 895 (E.D. Cal. 2004) (denying remand of CERCLA controversy in light of artful pleading).   "When a plaintiff has artfully pleaded in a manner that avoids an element of the tort that rests on federal law, the court 'may uphold removal even though no federal question appears on the face of the plaintiff's complaint.'"   *Gore v. Trans World Airlines*, 210 F.3d 944, 950 (8th Cir. 2000) (citing *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998)).

44.   Even though Plaintiffs avoid mentioning CERCLA, they repeatedly acknowledge Ameren's ongoing "cleanup efforts."   Pet. for Damages at ¶¶ 25–26, 31, 47.   Thus, Plaintiffs' simultaneous silence in avoiding a full description of the ongoing remediation at the Substation or the history of EPA action at the Findett Superfund Site is telling.   The City's proposed complaint in the Consent Decree Litigation recognized that Ameren's actions were "required" by the EPA's 2012 administrative order.   *United States v. Union Electric Co.*, No. 4:22-cv-1038-JAR, ECF No. 14-1, ¶ 33, Proposed Complaint.   Indeed, in the City's public statements, the City made it clear

that "once it become[s] a contamination site it's ultimately up to the EPA to enact the legal responsibilities upon Ameren to clean up their site," Exhibit 20,  Transcript of the City of St. Charles November 16, 2022 Public Meeting at 11.  Plaintiffs' silence in their Petition aside, the source of Ameren's legal obligations is federal law.

45.     In *Atlantic Richfield*, the Supreme Court stated that, under the facts of that case, the complaint did not present a federal question because the state law claims, as pleaded, did not "'necessarily raise[]' a federal issue." 140 S. Ct. at 1350 n.4.  *Atlantic Richfield*, however, is readily distinguishable on multiple grounds.  The plaintiffs were private landowners who sought a unique category of "restoration damages" available under Montana law without regard to the defendant's compliance with EPA administrative orders.  In other words, the plaintiffs' entitlement to this narrow relief did not turn on proving negligent remediation under federal administrative orders.  Furthermore, those plaintiffs were not municipal governments who previously sought to intervene in a pending federal lawsuit and only shifted forums because of a court-ordered stay to gain a perceived procedural advantage.   As acknowledged by *Atlantic Richfield*, there are cases, like this one, that "originate in state court yet still arise under federal law for purposes of federal question jurisdiction."  *Id.*

46.     In sum, Plaintiffs' state-law claims dispute Ameren's performance under the EPA's administrative orders and serve as a prospective attack on (and attempted circumvention of) the EPA's ongoing evaluation of whether to modify the cleanup plan set forth in the Proposed Consent Decree, which this Court will properly address in the Consent Decree Litigation after the conclusion of the stay. Therefore, the Petition for Damages necessarily presents a substantial, disputed question of federal law.

47.     The Court's exercise of jurisdiction also will not disrupt the "balance" between

federal and state jurisdiction adopted by Congress.  *Pet Quarters*, 559 F.3d at 779.  Congress has, in fact, expressed its desire to funnel CERCLA disputes to federal district courts by granting district courts "exclusive" original jurisdiction over all controversies arising under CERCLA.  42 U.S.C. § 9613(b).  Plaintiffs, on the other hand, have attempted to subvert congressional intent by consciously omitting any references to the EPA, CERCLA, or the administrative orders from their Petition for Damages as a pretext for filing in state court.

**B.      Plaintiffs Seek Response Costs Under CERCLA § 107.**

48.      By seeking to recover response costs, Plaintiffs are attempting to state a federal cause of action under CERCLA § 107, 42 U.S.C. § 9607, while simultaneously hiding their CERCLA response claim under nine layers of state law theory.

49.      CERCLA § 107 "unquestionably provides a cause of action" to seek recovery of response costs.  *Key Tronic Corp. v. United States*, 511 U.S. 809, 818 (1994).  As stated above, CERCLA grants federal district courts "*exclusive* original jurisdiction over all controversies arising under" the Act. 42 U.S.C. § 9613(b) (emphasis added).  This Court's exclusive jurisdiction necessarily includes actions to recover "response costs" under § 107 because "'[a] suit arises under the law that creates the cause of action.'"  *Atl. Richfield*, 140 S. Ct. at 1350 (quoting *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)).

50.      CERCLA does not contain a statutory definition of "response costs," but courts interpret response costs to include the recoupment of expenses for "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," as well as all necessary costs for removal and remediation. *Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1111–12 (E.D. Mo. 2016).

51.      In their Petition for Damages, Plaintiffs expressly seek to recover the costs they expended to respond to Ameren's alleged contamination during the process of remediation.

16

Specifically, Plaintiffs allege that, "due to the migration of Contaminants from Ameren's Substation, the City has incurred millions of dollars in costs to ensure the availability of safe drinking water free from Contaminants."  Pet. for Damages at ¶ 39.  Plaintiffs allege that "it was the City's treatment efforts … that have thus far succeeded in removing [volatile organic compounds] from the raw water prior to distribution."  *Id.* at ¶ 38.  In seven counts, Plaintiffs seek recovery of these "out-of-pocket expense[s]."  *See id.*, Prayer to Counts I, II, III, IV, V, VI and VII.

52.     Again, artful pleading cannot defeat federal subject matter jurisdiction.  The City itself knows where jurisdiction lies, which is why the City moved to intervene in the Consent Decree Litigation in this very Court.  Exhibit 10.  The City's public statements, media campaign, and court filings demonstrate their awareness of the EPA's involvement and their true intent.  In arguing against the Proposed Consent Decree, the City expressed concern about its ability to recover its response costs if the Court approved the consent decree and argued that it "must protect its right to seek contribution from Ameren under CERCLA §113(f)" for such costs.  *See* Exhibit 12 at 9.  A few weeks later, in a press release issued on February 24, 2023, after an EPA public meeting, the City stated: "Any remedy within the Record of Decision should require Ameren … to: 1) install a treatment system to remove their contaminants from drinking water, 2) relocate the City's drinking water wells, and 3) provide financial assurances for the costs of remediation, as well as damages incurred by the City for providing safe drinking water to residents over the past two decades." *See* Exhibit 21, *Media Advisory*, City of St. Charles, Mo, February 24, 2023.

53.     In sum, the City stated its explicit concern that, upon approval, the Proposed Consent Decree would prohibit the City's recovery of response costs in the future.  Now, after the EPA withdrew the Proposed Consent Decree and the Court stayed the litigation in the proper

federal forum, the City have sought to create a separate track to recover response costs during the pendency of the stay.  This was improper, and this Court has subject matter jurisdiction over their request for response costs under CERCLA § 107.

**C.    The Court Has Supplemental Jurisdiction Over Any Residual State Law Claims.**

54.    To the extent not described above, this Court has supplemental jurisdiction, 28 U.S.C. § 1367(a), over any residual state law claims in Counts I through IX because these claims arise out of the same set of transactions and occurrences that resulted in Plaintiffs' claims that rest on federal questions under CERCLA and the EPA's administrative orders.

**II.    The Court Also Has Jurisdiction Under the Federal Officer Statute, 28 U.S.C. § 1442(a)(1).**

55.    Section 1442(a)(1) allows for removal of any civil action against "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office."  28 U.S.C. § 1442(a)(1).  There are four elements to the federal officer statute: (1) the defendant is a "person" within the meaning of the statute; (2) the defendant has acted under the direction of a federal officer; (3) there was a causal connection between the defendant's actions and the official authority; and (4) the defendant has a colorable federal defense to the plaintiff's claims."  *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor and City Council of Balt.*, 141 S. Ct. 1532, 1538 (2021).

**A.    Ameren Is a "Person" That Has Acted Under the Direction of a Federal Officer.**

56.    As a corporation, Ameren is a "person" under 28 U.S.C. § 1442(a)(1).

57.    Section 1442(a)(1) requires the private party to be "authorized to act with or for federal officers or agents in affirmatively executing duties under federal law."  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151 (2007).  *Watson* defined "acting under" as a private person

who is under the "subjection, guidance, or control" of a federal officer, which "must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 151–52 .

58.     "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic*, 511 U.S. at 814.  For purposes of this dispute, the President has delegated the relevant responsibilities to the EPA Administrator.  *Atl. Richfield*, 140 S. Ct. at 1346 n.1.  "Prior to selecting a cleanup plan, EPA conducts (or orders a private party to conduct) a remedial investigation and feasibility study to assess the contamination and evaluate cleanup options."  *Id.* at 1346 (citing 40 C.F.R. § 300.430).  Instead of cleaning up the site itself, the EPA may enter into settlement agreements or a consent decree that delegates its responsibilities to the private party. *See* 42 U.S.C. § 9622(a).  Non-compliance may result in civil penalties.  *Id.* § 9622(*l*).

59.     The lengthy history between Ameren and the EPA provides an extensive basis for federal officer removal.  The 2012 Settlement Agreement required Ameren, among other actions, to perform soil and groundwater sampling at the Substation, contain and treat contaminated groundwater migrating from the Substation, and evaluate future remedial and removal action.  *See* Exhibit 3.  Ameren has been working under the direction, guidance, control, and oversight of the EPA since the execution of the 2012 Settlement Agreement, including by getting EPA approval of all of its investigations and remedial actions.  *See, e.g.*, *Greene v. Citigroup, Inc.*, 215 F.3d 1336, at *2 (10th Cir. 2000) (table) (upholding removal under federal officer statute because "Shattuck implemented a remedy selected by the EPA, a federal agency, pursuant to CERCLA, and it was subject to civil penalties for failure to comply with that directive").

60.     The 2018 Settlement Agreement required Ameren to complete the CERCLA remedial investigation and feasibility study.  Exhibit 3.  The EPA determined that response actions

were necessary at the Site and issued a Record of Decision selecting a remedy, including bioremediation and other groundwater treatment methods.

61.     In completing the removal and remediation of contaminants from the Substation and adjacent properties, Ameren acted under the ongoing direction, guidance, control, and oversight of the EPA to assist the EPA in carrying out its duties and responsibilities.  Not only was Ameren required to seek the EPA's approval of all remedial actions taken at the site, 42 U.S.C. § 9622(e)(6), but Ameren was required to retain financial assurance, get EPA approval of contractors and consultants it planned to use for the remedial efforts, and submit all reports and investigations to the EPA for approval.  *See* Exhibit 3.  That agreement recognizes that, if Ameren failed to complete the investigation or fails to complete the remedial actions to the EPA's satisfaction, Ameren could be subject to civil penalties and the EPA may be required to complete the necessary clean-up actions.  *See* Exhibit 3.  Under federal law, Ameren has been prohibited from taking any remedial actions without prior EPA approval.  42 U.S.C. § 9622(e)(6).  Ameren continues to operate under the 2018 Settlement Agreement and is currently conducting remedial actions pursuant to that agreement and the February 16, 2023 letter from the EPA.  *See* Exhibit 15.

**B.      There Is a Causal Connection Between Plaintiffs' Claims and the EPA's Official Authority.**

62.     Over the last decade, Ameren's actions with respect to the contaminants at the Substation or the Elm Point Wellfield have been taken pursuant to either the 2012 or 2018 Settlement Agreement with the EPA, representing a causal connection with the EPA's official authority.

63.     Each of Plaintiffs' state law claims address the actions Ameren took with respect to remediation and removal of contaminants, which Ameren undertook at the direction of the EPA. In their Petition for Damages, Plaintiffs make the following allegations regarding Ameren's efforts

to control and contain the contaminants, all of which were undertaken pursuant to the 2012 and 2018 Settlement Agreements: (a) "Ameren's cleanup efforts have failed to remove all Contaminants from the groundwater," Pet. for Damages at ¶ 31; (b) "Ameren acknowledged that its own efforts were insufficient to provide clean drinking water. 'By virtue of all well water being commingled at the [City's] water treatment plant, there is no foreseeable potential for a detectable amount of any [Contaminants] to enter the water distribution lines,'" *id.* at ¶ 37; (c) "Ameren further acknowledged it was the City's treatment efforts, not Ameren's efforts that have thus far succeeded in removing [volatile organic compounds] from raw water prior to distribution," *id.* at ¶ 38; and (d) "Due to migration of Contaminants from Ameren's Substation, the city has incurred millions of dollars in costs to ensure the availability of safe drinking water free from Contaminants for City residents and others, including the County and County residents," *id.* at ¶ 39.

64.     Furthermore, Plaintiffs' negligence claim directly addresses Ameren's remediation efforts, which Ameren undertook at the direction and under the control of the EPA.  In particular, the Plaintiffs allege that "Ameren owes a duty to the City and the County to operate and maintain its Substation so as to control and contain Contaminants on its property and to prevent the migration of Contaminants onto and in nearby properties."  *Id.* at ¶ 80.

## C.     Ameren Has a Colorable Federal Defense Based on CERCLA Preemption.

65.     Because Plaintiffs seek to attack the sufficiency of the EPA's response actions and chosen remedy, Ameren has a colorable federal defense to Plaintiffs' claims based on CERCLA preemption.  *See York v. Northrop Grumman Corp. Guidance & Elecs. Co.*, No. 21-03251-CV-S-BP, 2022 WL 19240760, at *5 (W.D. Mo. May 18, 2022); *see also Bartlett v. Honeywell Int'l, Inc.*, 260 F. Supp. 3d 231, 239–40 (N.D.N.Y 2017) (holding that state common law claims are pre-empted where "Plaintiffs seek to hold [Defendant] liable for damages allegedly resulting from activities that were consistent with the Consent Decree, on a theory that Defendant should have

conducted additional or different remediation").

66.     Namely, Plaintiffs allege the remediation efforts directed by the EPA were ineffective, and bring nuisance and other claims contending that the CERCLA cleanup was insufficient by alleging the "substantial impairment and unreasonable interference from the continued migration of contaminants is permanent and cannot be abated."  Pet. for Damages at ¶ 59.  As a result, Plaintiffs' claims for damages merely "seek to hold [Defendant] liable for damages allegedly resulting from activities that were consistent" with the 2012 and 2018 Settlement Agreements and pending Consent Decree "on a theory that Defendant should have conducted additional or different remediation."  *Bartlett*, 260 F. Supp. 3d at 239–40.  Ameren has a more than colorable defense that Plaintiffs' claims are preempted by CERCLA.

WHEREFORE, Defendant Union Electric Company d/b/a Ameren Missouri respectfully removes the State Court Action from the Circuit Court of St. Charles, Missouri to United States District Court for the Eastern District of Missouri, Eastern Division, so that this Court may assume jurisdiction over the cause as provided by law to the exclusion of any further proceedings in the state court.

Dated:  June 30, 2022                    Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:      /s/ Mark B. Leadlove
        Mark B. Leadlove              MO #33205
        Christopher J. Schmidt        MO #53362
        Mark Lenihan                  MO #75199
        Brittainy Cavender            MO #72275
        One Metropolitan Square
        211 North Broadway, Suite 3600
        St. Louis, Missouri 63102
        Telephone: (314) 259-2000
        Facsimile: (314) 259-2020
        mbleadlove@bclplaw.com

**BARNES & THORNBURG LLP**

        Joseph F. Madonia (pro hac vice pending)
        1 North Wacker Drive, Suite 4400
        Chicago, Illinois 60606
        Telephone: (312) 357-1313
        joseph.madonia@btlaw.com

        *ATTORNEYS FOR DEFENDANT UNION ELECTRIC COMPANY D/B/A AMEREN MISSOURI*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on June 30, 2023, a true and correct copy of the foregoing was served via email and U.S. Mail, postage prepaid, upon the following:

Jeremiah W. (Jay) Nixon
James F. Bennett
Erika Anderson
Dowd Bennett LLP
7676 Forsyth Blvd.
Suite 1900
St. Louis, MO 63105
jnixon@dowdbennett.com
jbennett@dowdbennett.com
eanderson@dowdbennett.com

Robert D. Blitz
Christopher O. Bauman
Christopher R. Pieper
Blitz, Bardgett & Deutsch, LLC
120 S. Central Avenue
Suite 1500
St. Louis, MO 63105
rblitz@bbdlc.com
cbauman@bbdlc.com
cpieper@bbdlc.com

**Attorneys for Plaintiff**

By: */s/ Mark B. Leadlove*
**Attorney for Defendant**